UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-10965-RWZ

VERMONT MUTUAL INSURANCE COMPANY

v.

DESMOND F. MAGUIRE, *et al.*

FINDINGS OF FACT AND CONCLUSIONS OF LAW

April 6, 2010

ZOBEL, D.J.

    Late one Saturday night, in a crowded Boston bar, an altercation occurred between college students who had imbibed a few too many drinks. The exact course of events that evening is not clear, but what began with pushing and shoving ended with Boris Maguire striking Robert Kalsow-Ramos in the face with a beer mug. The consequences of that event are clear: Kalsow-Ramos suffered a long, deep cut in his cheek, damaging muscle, fat, and his saliva duct and leaving permanent scars; Maguire and his family subsequently agreed to pay $425,000 in settlement of all civil and criminal liability.

    Maguire's parents held a homeowners insurance policy issued by Vermont Mutual which, under certain circumstances, covered liability for damages caused by bodily injury. They notified Vermont Mutual when Kalsow-Ramos made a claim and sought the insurer's approval when the settlement was reached a month and a half later. Vermont Mutual did not agree to the settlement and brought this declaratory

judgment action against Boris Maguire and his parents to establish its obligation, if any, to indemnify them. The Maguires counterclaimed for breach of the duty to defend and bad faith conduct in violation of Mass. Gen. Laws ch. 93A and ch. 176D.  After a five-day trial a jury found that Vermont Mutual was not obligated to indemnify the Maguires. The counterclaims were tried to the court on papers and evidence submitted by agreement.

**I.    Findings of Fact**

The altercation occurred at approximately 1:30 a.m. on November 24, 2007, at the Pour House, a bar in Boston's Back Bay neighborhood.  It involved Maguire, his friend Will Schaetzl, and Kalsow-Ramos, and lasted only moments.  Maguire was quickly thrown out of the bar.  After the staff realized the severity of the injuries a bouncer went in search of Maguire and located him a short distance from the entrance, but Maguire fled after being asked to return to the bar.  Kalsow-Ramos was taken to the hospital where he underwent surgery to stabilize his wound.  He would ultimately undergo multiple surgeries to repair his facial injuries.

Police were called to the bar.  They were unable to interview Kalsow-Ramos before he left for the hospital but they did speak with him later in the morning. According to the police report, Kalsow-Ramos told officers that Maguire struck him in the face with a beer mug and Will Schaetzl punched him the face.  The police also spoke with two witnesses who accompanied Kalsow-Ramos to the hospital, and the report indicates that they corroborated his statement.

In December 2007 the Maguire family learned that an application for a criminal

complaint had been filed and that there would be a criminal clerk's hearing at the Boston Municipal Court on January 4, 2008, to determine if probable cause existed to bring charges against Boris Maguire. They retained Max Stern, Esq., a lawyer specializing in criminal defense. Stern went to the court on January 4 where he met Paul Rufo, Esq., Kalsow-Ramos' counsel. The two attorneys discussed settlement and, at their request, the probable cause hearing was continued to February 29.

### A. The Settlement

Rufo formally notified Stern on January 9 that Kalsow-Ramos intended to pursue legal remedies. On January 16 he sent a detailed claim letter, accompanied by medical records, with a demand for $800,000 and an expiration date of February 1. Rufo insisted in subsequent settlement discussions that any settlement would have to occur prior to the probable cause hearing. On February 6 Rufo sent Stern a new settlement demand, for $475,000, with a proposed release of civil and criminal liability. At about the same time the Maguires retained John Markham, Esq., to assist in settlement. By February 11 Markham had negotiated a slight reduction in the settlement amount, to $450,000, with different payment terms. The parties reached a binding agreement on a settlement on February 12, but this initial settlement was contingent on Vermont Mutual waiving a particular policy provision. The insurer refused and the settlement lapsed. The final settlement, for a lump-sum payment of $425,000 rather than partially deferred payments totaling $450,000, and without any insurer dependent contingencies, was signed by Kalsow-Ramos and his family and the

Maguires on February 26, the last business day before the February 29 probable cause hearing.

In the settlement agreement, the signatories released all claims in respect to each other "that were asserted or could have been asserted in any civil or criminal action." (Settlement Agreement and Release 2, Joint Exhibit 13.)  Rufo was obligated to tell the Boston Police that Kalsow-Ramos did not wish to bring charges, and to obtain confirmation that the police would not proceed independently against Maguire or Will Schaetzl.  If Rufo were unable to secure such a confirmation the agreement was null and void, and if the police later brought charges against Maguire the settlement money had to be returned.  Rufo did speak with representatives of the Boston Police and they withdrew the application for a criminal complaint.  Finally, the settlement also included confidentiality provisions.

### B. Vermont Mutual

Vermont Mutual issued a homeowners insurance policy to Boris Maguire's parents, policy number HO1 2-26-83-68, that was in effect on the date of the altercation.  The policy provided liability coverage for the insured (including Boris) to a maximum of $500,000 in damages resulting from bodily injury caused by an "occurrence."  An occurrence, defined in the policy as an accident, expressly excludes damage resulting from bodily injury which is expected or intended by the insured.  The policy also includes a condition prohibiting voluntary payment.

On January 9, 2008, Stern notified Vermont Mutual, by way of the Maguires' insurance agent, of the incident in the Pour House and Rufo's representation of

Kalsow-Ramos. He forwarded the detailed claim letter on January 17. Vermont Mutual opened a claim file on January 11 and assigned Mark McGreevy to investigate. McGreevy spoke with Stern on the 11th and requested the opportunity to interview Maguire. McGreevy also noted in the claim file that Maguire may have committed an intentional act.

McGreevy attempted to interview the witnesses identified in the police report and those working at the Pour House. All the witnesses refused to be interviewed. Stern also conditioned any interview with Maguire, and later any interview with the witness Chris Markham, on the maintenance of attorney-client privilege. It is unclear why such an interview would be privileged, but Vermont, in any event, considered the condition unacceptable and did not interview either Maguire or Chris Markham. McGreevy contacted Rufo on January 23 in an unsuccessful attempt to interview Kalsow-Ramos. In his conversation with Rufo, McGreevy stated that the insurer had just begun to investigate the incident and was far from ready to offer to settle.

On February 4 McGreevy sent Stern a reservation of rights letter in which Vermont Mutual indicated it would continue to handle the claim, but that the claim may be excluded as expected or intended, or because Stern had not produced Maguire for an interview. He also attended a Boston Licensing Board hearing concerning the altercation at which several Pour House employees testified. He ordered a transcript of the hearing and attempted to interview the employees afterward. They declined to be interviewed.

Stern forwarded the February 6 settlement offer to McGreevy on February 7. He reiterated that any interview with Maguire, or access to witness statements in Stern's possession, would have to be subject to attorney-client privilege. On February 11 Markham wrote to McGreevy and formally requested that Vermont Mutual either approve a settlement of $450,000 or agree to waive the voluntary payment provision in the policy. He also, for the first time, made Maguire available to interview without concern for any privilege and shared the eyewitness statements also previously withheld on grounds of privilege. McGreevy telephoned Rufo on February 15 to discuss the application for the criminal complaint, but Rufo indicated that he was uncomfortable talking directly with McGreevy and suggested communicating through Stern instead.

Vermont Mutual retained Peter Kober, Esq., in early February. On February 15 he told Markham, by letter, that Vermont Mutual did not agree to pay the amount of the settlement or waive the voluntary payment exclusion in the policy and would continue to reserve its rights. He identified as concerns the possibility of intentional conduct, ethical issues relating to a cash settlement of criminal liability, as well as the reasonableness of the settlement, and he emphasized that the aggressive settlement deadline afforded Vermont Mutual insufficient time to conduct an investigation.

Vermont Mutual was notified of the February 26 settlement on March 5th. Kober interviewed Maguire, under oath, sometime in April. On May 8 Markham wrote to Kober and demanded Vermont Mutual pay the settlement and attorney fees. He asserted that the insurer had violated the requirements of Mass. Gen. Laws ch. 176D,

and he threatened suit but offered, alternatively, to submit to arbitration at least the question of reasonableness. Kober responded on June 6, by letter, that Vermont Mutual was still investigating, and he reiterated concerns about intentional conduct by Maguire, the reasonableness of the settlement, as well as the inclusion of a release from criminal liability for Boris and Will Schaetzl, an individual not covered under the policy. It filed this action for declaratory judgment that same day.

### C. Procedural History

Vermont Mutual's two-count complaint sought a declaratory judgment that it had not breached a duty to defend Maguire and had no duty to indemnify the Maguires with respect to the settlement. The Maguires answered and counterclaimed for violations of Mass. Gen. Laws ch. 176D. The parties agree that the counterclaim raises two issues: (1) did Vermont Mutual breach a duty to defend; and (2) did Vermont Mutual act in bad faith when it refused to participate in the settlement negotiation.

The question whether Vermont Mutual had a duty to indemnify the Maguires was tried before a jury, while the ch. 176D counterclaims were reserved for the court. After a five-day trial the jury returned a verdict in favor of Vermont Mutual. It found that the injury to Kalsow-Ramos was the result of an accident rather than expected or intended and that the settlement amount was reasonable, but it also determined that the settlement prejudiced Vermont Mutual's ability to protect its interests. The court now decides the remaining duty to defend and bad faith counterclaims.

## II. Conclusions of Law

### A. Duty to Defend

The boundaries of an insurer's duty to defend are defined by the terms of the insurance policy. See, e.g. Hazen Paper Co. v. U.S. Fid. & Guar. Co., 555 N.E.2d 576, 579 (Mass. 1990) (analyzing the contract language to define the insurer's duty to defend). "The interpretation of an insurance contract is a question of law. . . . Every word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable." Boston Gas Co. v. Century Indem. Co., 910 N.E.2d 290, 304 (Mass. 2009) (internal citation omitted).

Insofar as relevant, the obligations of the insurer are defined in the policy as follows:

> Coverage E - Personal liability
> If a claim is made or suit is brought against an "insured" for "bodily injury" or "property damages" caused by an "occurrence" to which this coverage applies, we will:
> . . .
> 2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate.

(Vermont Mutual Homeowners Policy, Policy Number HO1 2-26-83-68, Joint Trial Exhibit 1, at 12.)

This provision sets forth two obligations of the insurer that may be triggered by a claim or suit. First, Vermont Mutual is required to provide counsel in the event of suit. Second, Vermont Mutual "may" investigate and settle a claim or suit. The policy does not state that Vermont Mutual will provide counsel if a claim is made, or that it must settle claims that are made.

Here, the obligation to provide counsel in the event of a suit was not triggered. Kalsow-Ramos did not file a lawsuit against the Maguires. While the Supreme Judicial Court ("SJC") has held that the duty to defend in the event of a suit may be triggered before a suit is filed, in the particular context of a CERCLA notice from the United States EPA, the SJC called the question "a close one" and expressly distinguished a CERCLA notice from "a conventional demand letter based on a personal injury claim." Hazen Paper Co., 555 N.E.2d at 580-81.

In any event, as articulated by the Maguires their claim is that Vermont Mutual violated its contractual obligation by refusing to provide any assistance in negotiating the settlement and, in effect, leaving them in the lurch while Rufo's settlement deadlines were looming.  The facts are otherwise.  Vermont Mutual took all reasonable investigatory steps in the limited, seven-week timeframe between notice of the claim and the settlement.  Representatives of the insurer attempted to interview relevant parties, reviewed the police record, and attended the liquor board hearing concerning the incident.  While the investigation did not yield much information, primarily due to a lack of cooperation from witnesses including Boris Maguire, the insurer did all it was obligated to do under the policy.  Vermont Mutual did not refuse to defend or participate in a reasonable settlement; it did decline to move at the speed dictated by the Maguires and it did decline to participate in a settlement it deemed possibly unethical and which was beyond the scope of its contractual obligation.

Vermont Mutual fully explained its position.  McGreevy told Rufo on January 23 that Vermont Mutual was not ready to settle.  The Maguires knew that Vermont Mutual

was not ready to settle shortly after February 4, at the very latest, when they received McGreevy's reservation of rights letter. They were, again, told in the February 15 letter from Kober with a list of the insurer's concerns that Vermont Mutual was not ready to settle, and additionally that the insurer did not consent to the February 12 settlement.

Rufo, Stern, and Markham nevertheless proceeded. All counsel were well aware that Vermont Mutual was investigating the claim. Nonetheless, they signed a settlement to which they knew Vermont Mutual would not agree, and they did not inform the insurer of the exact settlement terms until a week after the settlement was signed. Further, the settlement deadlines were driven by concerns entirely external to the civil claim, namely, the criminal probable cause hearing. It is not reasonable to expect Vermont Mutual to investigate and settle this claim involving disputed facts and questions of coverage in seven weeks. Moreover, the threat of a civil lawsuit exists with every personal injury claim and does not require some extraordinary settlement effort in response.

### B.     Bad Faith

Although the counterclaim asserts bad faith for both a failure to indemnify and a failure to defend, the Maguires do not argue the former which I therefore deem waived. However, allegations of bad faith do focus on Vermont Mutual's activities in connection with the settlement negotiations. A refusal to participate in a settlement based on a reasonable and good faith belief that there is no obligation to pay is not bad faith conduct in violation of ch. 176D, even if that belief turns out to be mistaken, so long as the insurer takes active steps to resolve the dispute. See Premier Ins. Co. of Mass. v.

Furtado, 703 N.E.2d 208, 210 (Mass. 1998).  For the reasons discussed below, Vermont Mutual's refusal to accept the proposed settlement was reasonable and did not violate ch. 176D, based upon both the evidence that Maguire's conduct may have been expected or intended and the inclusion in the settlement of the release of claims not covered by the policy.

With respect to the claim of bad faith in the settlement process, I conclude, first, that Vermont Mutual took reasonable investigatory steps in the minimal time available prior to the settlement, and the limited facts discovered suggested a strong possibility that Maguire's conduct was intentional and therefore not covered under the policy. There was no dispute that Maguire struck Kalsow-Ramos in the face with a beer mug, and the narrative in the police report and the sworn statement of Kalsow-Ramos prepared as part of the Boston Licensing Board proceeding suggested intent.  Vermont Mutual was unable to obtain statements from other witnesses, a failing for which the Maguires are partly responsible as they limited access to Boris Maguire until February 11th.  By that time Stern, Markham, and Rufo had already negotiated the first settlement which, although voided by an unsatisfied contingency, closely mirrored the dollar amount and terms of the final settlement.  Ordinarily, an insurer with such limited information could utilize discovery to learn the facts in the event that a lawsuit is filed, but that possibility was foreclosed by the settlement.

Second, the settlement negotiations and the terms of the settlement expressly concerned potential criminal liability, liability not covered by the policy.  The negotiation timeline was fixed by the criminal complaint hearing rescheduled to February 29.  The

February 11 letter from Markham to Vermont Mutual listed five reasons why "time is of the essence," and three of the those reasons relate only to criminal liability.  (Letter from Markham to McGreevy 4, Joint Exhibit 41.)  The settlement by its terms is intended to "resolve all claims, civil or criminal."  (Settlement Agreement and Release 2.)  It required counsel for Kalsow-Ramos to inform the Boston Police that Kalsow-Ramos did not wish to pursue charges and to obtain confirmation that no charges would be filed against either Maguire or Will Schaetzl, a party not covered by the Vermont Mutual policy.  If, at any future date, charges are filed against Maguire, Kalsow-Ramos is required to refund the settlement money.

Third, Vermont Mutual's concern that the settlement may be unethical was reasonable.  See Mass. Bar Ass'n Ethics Opinion 79-07.

Fourth and finally, Vermont Mutual took action to resolve the dispute, rather than simply refusing to pay and participate in the settlement.  The insurer sought and relied on the opinion of outside counsel, see Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 545 N.E.2d 1156, 1160 (Mass. 1989) (noting, in the insurer's favor, that the insurer "asked for, received, and relied upon an opinion from outside counsel regarding its liability"), and brought this declaratory judgment action, cf. Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 555 N.E.2d 568, 575 (Mass. 1990) (holding "[a] declaratory judgment in an action provides an appropriate means of deciding a dispute concerning the meaning of language in an insurance policy").

**III.     Conclusion**

Vermont Mutual did not breach a duty to defend the Maguires and did not act in bad faith in violation of the requirements of ch. 176D.  Judgment may be entered for Vermont Mutual on the complaint declaring that it had no duty both to provide a defense for Boris Maguire and to reimburse Desmond, Josephine, and Boris Maguire the amount of $425,000 paid in settlement to Robert Kalsow-Ramos, and judgment may be entered for Vermont Mutual on the counterclaim.

|  |  |
|---|---|
| April 6, 2010 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |